Filed 6/6/25  In re M.G. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re M.G. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>R.F. et al.,<br><br>Defendants and Respondents;<br><br>M.G. et al.,<br><br>Appellants. | F088278<br><br>(Super. Ct. Nos. 20CEJ300388-4, 20CEJ300388-5)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Mary Dolas, Judge.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Plaintiff and Appellant.

Jamie A. Moran, under appointment by the Court of Appeal, for Appellants M.G. and E.G.

Aida Aslanian, under appointment by the Court of Appeal for Defendant and Respondent R.F.

Patricia K. Saucier, under appointment by the Court of Appeal for Defendant and Respondent E.A.

-ooOoo-

## INTRODUCTION AND SUMMARY

In December 2020, five siblings, ages three through 15 years old, were taken into protective custody pursuant to Welfare and Institutions Code section 300, former subdivision (b)(1) and subdivision (d),[1] after 13-year-old I.G. disclosed sexual abuse by her stepfather, E.A.[2] Over the course of this dependency proceeding, the two oldest children, H.G. and I.G., were placed with their father, H.C., and the middle sibling, A.G., was placed with her adult sister, Es. G.

In May 2024, at the permanency planning hearing set for 10-year-old A.G., eight-year-old M.G., and six-year-old E.G. pursuant to section 366.26, the juvenile court became aware that Es. G. had sought placement of A.G., M.G., and E.G. from the outset of the case. The Fresno County Department of Social Services (Department) eventually placed A.G. with Es. G. after she required a new placement due to behavioral issues, but the record does not reflect that Es. G. was otherwise considered for placement. Following the hearing, Es. G. filed a section 388 petition seeking a change of court orders and placement of M.G. and E.G.[3]

After holding two additional hearings to address the issues and concerned with the absence of any indication the Department complied with section 361.3 despite its awareness of Es. G. from the outset of the case, the juvenile court issued orders under section 366.26 finding M.G. and E.G. adoptable, but declining to terminate parental rights based on the parental-benefit and the sibling relationship exceptions, adopting a

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

Following amendment by Senate Bill No. 1085 (2021–2022 Reg. Sess.), effective January 1, 2023, the section 300, subdivision (b)(1), allegations in this case are now set forth in section 300, subdivision (b)(1)(A) and (B).

[2] E.A. is the father of the three youngest children, A.G., M.G., and E.G. H.C. is the father of the two oldest children, H.G. and I.G.

[3] At the time, M.G. and E.G. were in a placement with foster parents who desired to adopt them.

permanent plan of placement with an appropriate and willing relative, and directing the Department to place them with Es. G. via an appropriate transition plan. The court denied Es. G.'s section 388 petition as moot.

The Department, M.G. and E.G. appeal from the court's section 366.26 orders.[4] Their main focus is the claim that the juvenile court erred when it found the parental-benefit and the sibling relationship exceptions applicable and declined to terminate parental rights. (§ 366.26, subd. (c)(1)(B)(i), (v).) If we conclude an exception to the termination of parental rights applies, the Department, joined by M.G. and E.G., claims the juvenile court erred when it failed to address legal guardianship with the children's then-current caregivers, in adherence to the statutory order of preference. (*Id.*, subd. (c)(4)(A).) Finally, the Department, joined by M.G. and E.G., claims that the juvenile court misapplied the section 361.3 relative placement preference within the context of the permanency planning hearing and abused its discretion when it ordered the children's placement be changed from the current caregivers to Es. G.

Respondent R.F. (Mother) focuses on the Department's error under section 361.3. Relying on the recent decision in *N.J.*, Mother argues that the juvenile court did not err when it considered the prejudicial impact of the Department's failure to assess Es. G. for placement, as required by section 361.3. (*In re N.J.* (2024) 104 Cal.App.5th 96, 104 (*N.J.*).) Relatedly, Mother argues that California law provides for emergency placement with a relative, but there is no showing it was considered; the juvenile court had a duty to ensure compliance with section 361.3 at least up until the dispositional hearing and failed to do so; and the statutory relative placement preference under section 361.3 is triggered whenever a child is moved, but based on the Department's recordkeeping, the court was not aware of the failure to comply with section 361.3 until the permanency planning hearing. Mother states that the children are now in a placement with Es. G., along with

---

[4] A.G. did not appeal.

A.G. She requests remand of this matter to the juvenile court for a new permanency planning assessment that includes consideration of their current circumstances. Father E.A. joins in Mother's arguments.

This is an unusual and difficult case in which the record reflects that the Department was aware of Es. G. and her interest in the children from the outset of the dependency case, and Es. G. complied with the limited directives she was given. Only later in the proceedings, when A.G. required a placement change due to behavioral issues, did the Department assess Es. G. for placement. (§ 361.3, subd. (d).) The record does not reflect that the Department gave Es. G. preferential consideration under section 361.3, subdivision (a), at any earlier point or considered placing M.G. and E.G. with her at any point. The reasons underlying the failure to comply with the statute do not appear in the record.

As an initial matter, discussed in greater detail below, the parties were on clear notice both that the juvenile court was going to consider the statement made by Es. G. when she addressed the court at the hearing and that section 361.3 was at issue. However, over the course of the three relevant hearings, the Department objected only to consideration of hearsay statements. It did not request that Es. G. be sworn in, it did not seek to question Es. G., it did not avail itself of the opportunity it was given to request an evidentiary hearing, and it did not investigate and dispute Es. G.'s summary of events despite being given the opportunity to do so. As such, the Department waived the issue of Es. G.'s unsworn statement in the juvenile court and any appellate claim that the juvenile court abused its discretion in considering the statement is forfeited. We also reject the Department's claim that the court abused its discretion in finding section 361.3 applicable. Although each case involves some variation of facts and procedure, the Department's inexplicable failure to assess Es. G. for placement and document its assessment in compliance with section 361.3, despite its awareness that Es. G. was interested in placement from the outset, places this case squarely in the category of error

4.

at issue in *N.J.*, *Isabella G.* and *R.T.* (*N.J., supra*, 104 Cal.App.5th at p. 104; *In re Isabella G.* (2016) 246 Cal.App.4th 708, 722–723 (*Isabella G.*); *In re R.T.* (2015) 232 Cal.App.4th 1284, 1300–1301 (*R.T.*).) However, the court's attempt to remedy the error through the permanency planning orders was procedurally flawed because it conflated what are separate issues subject to different statutory requirements. (*Isabella G., supra*, at p. 724.)

Accordingly, we vacate the court's section 366.26 orders and order denying Es. G.'s section 388 petition as moot. Because M.G. and E.G. joined A.G. in a placement with Es. G. after this appeal was filed and have presumably been in that placement for six months now,[5] we remand this matter for further proceedings consistent with this opinion, to include proceedings under section 361.3 as may be necessary depending on the parties' current positions and for new permanency planning orders given the children's current circumstances. In light of this disposition, appellants' claim that the court erred in declining to terminate parental rights based on the parental-benefit and the sibling relationship exceptions is moot and we do not consider it. We also need not consider their claim that it was error not to consider legal guardianship with M.G.'s and E.G.'s then-caregivers.

On the facts of this case, the following bears emphasis: "Section 361.3 *requires* the court to give preferential consideration to a request by the child's relative for placement, including an assessment of whether *placement* with a relative is in the child's best interest." (*Isabella G., supra*, 246 Cal.App.4th at p. 723.) Furthermore, child protective services and the juvenile court system "cannot completely abdicate their duties in applying the legislative preference of placing detained children with a family member,

---

[5] The relevant order from December 11, 2024, was included as an exhibit to Mother's motion to dismiss the appeal as moot, with a motion to augment the record. Mother's motions were denied, but subsequently, on our own motion, we ordered the record augmented to include the court's orders from that date and the Department's report prepared for that hearing. These records reflect M.G. and E.G. were placed with Es. G. toward the end of November 2024.

to the detriment of the child and the family, and then later rely on the passage of time caused by their own failures to preclude that relative from seeking placement of the child as a finding based on the child's best interests." (*N.J., supra*, 104 Cal.App.5th at p. 130.) While we recognize that this case involved a significant passage of time and the issue was brought before the court late in the proceedings, causing needless pain to the children, the family, and the foster parents who had hoped to adopt M.G. and E.G., courts have applied the relative placement preference "after the reunification period where the relative has come forward seeking placement of the child during the reunification period and the agency has ignored the relative's request for placement." (*In re Maria Q.* (2018) 28 Cal.App.5th 577, 593 (*Maria Q.*), citing *Isabella G., supra*, 246 Cal.App.4th at p. 723.) Therefore, we find no abuse of discretion in the juvenile court's foundational assessment that there was error under section 361.3, and we remand the matter for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL HISTORY

### I.     Referral, Removal, and Detention Hearing

In December 2020, Mother and her five minor children, three-year-old E.G., four-year-old M.G., seven-year-old A.G., 13-year-old I.G., and 15-year-old H.G., were living with E.A., the father of the youngest three children. One of Mother's adult daughters, B.M., and B.M.'s child also lived in the home. On December 7, 2020, the Department received a referral for general neglect after I.G. disclosed to her doctor that when she was in the care of E.A. for one year while Mother was in Mexico, E.A. rubbed her shoulder and thigh, and he asked her to kiss him. I.G. reported she was afraid to tell Mother because she feared Mother would be mad and because the same thing happened to her adult sister and Mother did not believe her sister.

On December 15, 2020, a Department social worker and law enforcement made contact with the family. I.G. disclosed to an officer that E.A. also made her watch pornography, exposed his genitals, and asked her to touch his penis, which she refused.

6.

Mother told the social worker she was not aware of E.A.'s actions toward I.G. until that day, but she denied he had sexually abused her adult daughter. The officer informed the social worker that Mother was somewhat aware E.A. had asked I.G. for sexual favors but not of the extent of his behavior until that day. As E.A. resided in the home, Mother's five children were taken into protective custody.

On December 17, 2020, the Department filed a petition alleging four counts: Mother failed to adequately supervise and protect I. from E.A.'s sexual abuse (§ 300, former subd. (b)(1); count b-1), I.G. was sexually abused by E.A. and Mother failed to protect her from his sexual abuse (§ 300, subd. (d); counts d-1 & d-2), and H.G., A.G., M.G. and E.G. were at substantial risk of sexual abuse by E.A. (§ 300, subd. (d); count d-3). On December 18, 2020, the Department filed an amended petition alleging in count d-3 that A.G., M.G. and E.G. were at substantial risk of sexual abuse by E.A., and adding the allegation that H.G., A.G., M.G. and E.G. were at substantial risk of sexual abuse by E.A. based on Mother's failure to protect I.G. from his sexual abuse (§ 300, subd. (d); count d-4).

The Department's detention report reflected that H.G. and I.G. were together in a foster home, and A.G., M.G. and E.G. were together in another foster home. The report stated there were relatives to consider for placement, and a social worker had contacted the children's adult siblings, M.M. and Es. G. M.M. reported she did not have the capacity to care for her siblings, but Es. G. reported she lived in a studio apartment with her partner and was willing to care for her siblings. Es. G., along with adult siblings M.M. and B.M., had attended the team decision making (TDM) meeting with Mother on December 17, 2020.

On December 17, 2020, E.A. contacted the Department and represented he was in Mexico and did not plan to return. He stated he was not going to attend the detention hearing and did not want services. He planned to work in Mexico and send money for his children, and he did not want to jeopardize the children's return to Mother.

On December 18, 2020, the juvenile court held a detention hearing and found a prima facie showing had been made that the five children came within section 300. The court ordered all five children detained from Mother; E.G., M.G. and A.G. detained from their presumed father, E.A.; and the children placed in the temporary custody of the Department. The court ordered the Department to facilitate one-hour visits between Mother and the three oldest children no less than once a week and between Mother and the two youngest children no less than twice a week, found the suitability of relatives not yet determined, and granted the Department discretion to order visitation with any approved relatives.

## II.    Combined Jurisdiction and Disposition Hearing

On February 24, 2021, the court held a combined jurisdiction and disposition hearing. The Department's report reflected Mother had been having video visits with the children, and the concurrent plan for the children was placement with a fit and willing relative. The Department indicated it would be contacting Es. G., and that Mother was beginning to engage in services and the prognosis for successful reunification was good.

The juvenile court sustained the petition allegations and found the five children as described by section 300, former subdivision (b)(1) and subdivision (d). The court adjudged the children dependents of the court under section 300, former subdivision (b)(1) and subdivision (d), and found by clear and convincing evidence that there is or would be a substantial danger to their physical health, safety, protection, or physical or emotional well-being if they were returned home, and there were no reasonable means by which their physical health could be protected without removing them from Mother's and E.A.'s physical custody. H.G.'s and I.G.'s presumed father, H.C., had been located and he desired placement of them, but the court found, by clear and convincing evidence, that placement with him would be detrimental to their safety, protection, or physical or emotional well-being. The order reflected that the court

considered placement with relatives and could not make a determination at that time, and that the children's current placements were appropriate.

The court found minimal case plan progress by Mother and H.C., and no progress by E.A. given the Department's inability to locate him. The court ordered reunification services for Mother and H.C., ordered supervised visitation between Mother and the five children once a week, and set a six-month status review hearing.

## III. Six-month Review Hearing

In August 2021, the Department's six-month status report reflected that H.G. and I.G. were together in one foster care placement, M.G. and E.G. were together in another foster care placement, and A.G. was in a third foster care placement. Mother was living alone and engaged in parenting classes, therapy and a child abuse intervention treatment program; and she had progressed from unsupervised visits in April 2021 to liberal visits in June 2021. The report reflected that Mother did not report any relative willing to provide a plan of legal guardianship if she was not able to reunify with the children, the Department would continue to assess placement with a fit and willing relative, and the Department would assess grandparents and extended family members for visits.

At the six-month review hearing on August 11, 2021, the court found Mother's progress moderate to significant, and H.C.'s moderate. Reunification services were continued, and the court set a 12-month review hearing.

## IV. Request for Modification of Visitation Order

Days after the six-month review hearing, the Department filed a section 388 petition requesting reduction of Mother's visitation from liberal to supervised based on M.G.'s and E.G.'s disclosures to a social worker that E.A. spent the night at Mother's house during their weekend visitation. The court reduced visitation to supervised visits and set the matter for a contested hearing. An investigator with Fresno Child Advocates interviewed the five children and filed a report documenting that H.G. and I.G. denied E.A. had been present; M.G. said the last time she saw E.A., the weather was cold and he

brought her Christmas presents; and E.G. indicated he saw E.A. at Mother's residence with the "'policia (police)'" and answered inconsistently that it was cold and then hot the last time he saw E.A.[6] On October 18, 2021, the court denied the Department's petition on the ground there was insufficient evidence to support the request and ordered liberal visitation be resumed.

## V.      Twelve-month Review Hearing

The Department's 12-month status report reflected that H.G. and I.G. remained together in one foster care placement, M.G. and E.G. remained together in another foster care placement, and A.G. remained in a third placement. The children continued to have overnight visits with Mother, but the Department remained concerned that E.A. was in the home during visits, and M.G.'s and E.G.'s foster parents reported sexualized behaviors, including poor boundaries and inappropriate affection. The report reflected Mother did not report any relative willing to provide a plan of legal guardianship if she was not able to reunify with the children, and the Department would continue to assess relatives.

At the review hearing on February 2, 2022, the court found Mother's and H.C.'s progress significant. Reunification services were continued, and the court set an 18-month review hearing.

## VI.     Request for Modification of Visitation Order

On March 18, 2022, the Department filed a section 388 petition requesting reduction of Mother's visitation from liberal to supervised based on E.G.'s disclosures that Mother hit him with a clothes hanger, which left a visible mark, and that his father lives at the home. The court reduced visitation to supervised visits and set the matter for a contested hearing. On May 11, 2022, the court granted the Department's request and reduced Mother's visitation from liberal to supervised.

---

**6**      The second page summarizing the majority of the investigator's interview with A.G. is missing.

## VII.    Subsequent Petition Proceedings

On June 8, 2022, following the injury to E.G.'s face and interviews with the children, the Department filed a subsequent petition alleging M.G. and E.G. suffered serious physical harm inflicted nonaccidentally by Mother, who reportedly disciplined E.G. by hitting him in the face with a hanger and disciplined M.G. with her hand. (§§ 342, 300, subd. (a); count a-1.)  The petition also alleged that H.G., I.G., and A.G. were at substantial risk of suffering serious physical harm inflicted nonaccidentally by Mother.  (§ 300, subd. (a); count a-2.)  The same day, the Department filed an amended subsequent petition to omit a previous representation concerning the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) and include a true name finding for A.G.

On June 9, 2022, the court held a detention hearing on the section 342 petition. The court ordered that the children remain removed from Mother and her visitation be supervised, and set a combined jurisdiction and disposition hearing.  The Department's detention report reflected there were no relatives to consider for placement, but the Department would continue to search on an ongoing basis.

## VIII.   Combined Jurisdiction and Disposition Hearing and 18-month Review Hearing

The Department's jurisdiction and disposition report prepared in July 2022 indicated A.G. was placed in a respite home in March 2021 after reports of inappropriate sexualized behavior by A.G. toward M.G. and possibly E.G., although M.G. denied any touching occurred.  In June 2021, A.G. was moved to a placement in Madera County. Subsequently, in July 2021, the Department received a report that E.A. had molested A.G. on more than one occasion.  Both referrals were evaluated out.  In June 2022, A.G. stayed with M.G. and E.G. while her caretaker was traveling, but M.G.'s and E.G.'s foster parents reported they were unable to take placement of A.G. because her bullying behavior toward M.G. and E.G. was destabilizing their behavior.  The report also reflected no relatives were requesting placement of the children.

11.

On October 17, 2022, the juvenile court held a combined jurisdiction and disposition hearing on the amended subsequent petition allegations and an 18-month review hearing. The court sustained the allegations in the amended subsequent petition, terminated Mother's reunification services, reduced visitation to supervised visits once a month for one hour, and set a section 366.26 hearing for January 30, 2023.

## IX. Section 366.26 Hearing and Related Proceedings

### A. Summary of Continuances

On January 30, 2023, the court granted the Department's request for a 180-day extension of time to assess the most appropriate plan for A.G., M.G. and E.G.

On July 31, 2023, the court granted the Department's request for a 60-day continuance on the same ground, based on the assignment of a new social worker to the case.

On September 25, 2023, the court granted a two-week continuance to allow the children's counsel to speak with them given the Department's recommendation of adoption for M.G.'s and E.G.'s permanent plan and for an assessment of the sibling relationship.

On October 16, 2023, after E.A. made his first appearance and counsel was appointed to represent him, the court continued the hearing two weeks.

On October 30, 2023, the court continued the hearing to December 2023 to secure Spanish and Mixteco interpreters for Mother and E.A.

On December 11, 2023, the court continued the hearing to January 2024 due to communication issues with E.A., who was appearing remotely and assisted by a noncertified interpreter.

On January 22, 2024, Mother objected to the Department's recommendation and, joined by E.A., requested a contested hearing and a settlement conference.

On March 13, 2024, at the settlement conference, the court confirmed the matter for Mother's contested hearing. E.A. withdrew his contest to the Department's

12.

recommendations, and the interpreter present specified Mother would need a Mixteco-Alta interpreter at the contested hearing.

On March 20, 2024, the matter was continued so an interpreter for both Mixteco-Alta and Mixteco-Baja could be present. Mother's attorney informed the court at the outset of the hearing that he previously spoke to Mother through a Spanish interpreter and it was not adequate so he had requested a Mixteco-Alta interpreter. However, Mother stated she did not know what dialect she spoke, and the Mixteco-Alta interpreter said that while she and Mother could understand one another, Mother could not understand the interpreter well enough to proceed.

On March 25, 2024, Mother's counsel was not present due to a family emergency and counsel for the three children declared a conflict necessitating separate counsel for M.G. and E.G. In addition, the interpreter stated that Mother needed a Mixteco-Alta interpreter, but Mother said she would prefer to switch to a Spanish interpreter. She explained she did not understand either Spanish or Mixteco 100 percent, and after the interpreter clarified where Mother was from, the court expressed its intent to find an interpreter from Mother's area if possible.

On April 3, 2024, additional issues arose concerning translation, as the Spanish and Mixteco interpreter did not speak English, and Mother's counsel requested the matter be set for trial.

**B.    Section 366.26 Hearings and Section 361.3 Issue**

**1.    Department's Reports**

The Department's section 366.26 report from January 2023, authored by social worker Maribel C., requested 180 days to assess the most appropriate permanent plan for A.G., M.G., and E.G., as previously summarized. The report reflected that A.G. and M.G. had "severe emotional and physical behavioral outbursts." E.G. had "mild behavioral and emotional outbursts and tantrums" that were decreasing over time. A.G. had been in her current placement for five months and the caregiver was not prepared to

13.

provide a permanent plan due to A.G.'s tantrums. M.G.'s and E.G.'s caregivers of 10 months were willing to provide a permanent plan of legal guardianship, but they had concerns about the children's behavioral and emotional issues. M.G. and E.G. wanted to remain with their caregivers, as they loved them.

The Department's July 2023 status report, authored by the newly assigned social worker, Monica R., requested a 60-day continuance to assess the most appropriate permanent plan for the children, as previously set forth. The report reflected the previous social worker had left the Department.

The Department's section 366.26 report, prepared in September 2023 by Monica, stated that A.G., M.G. and E.G. all had behavioral issues and were removed from foster homes as a result. A.G. continued to have issues, but was improving. However, her caregiver was not willing to provide a permanent plan of adoption or legal guardianship due to her behavior and her continued interest in returning to Mother. In March 2022, M.G. and E.G. were placed with their current caregivers, who wanted to adopt them and with whom they had built a parent-child relationship. M.G. and E.G. expressed they wanted to stay in their current placement and the report concluded Mother did not appear to have a significant parent-child relationship with them and they did not view her as a parental figure.

The report also documented that in late August 2023, Monica contacted Es. G., who stated she was interested in placement of the children and would like assistance completing the steps. Monica informed Es. G. the Department was only looking to place A.G. and she would look into how far Es. G. got in the resource family approval (RFA) process. When Monica subsequently contacted the RFA unit, she was informed there was no file for Es. G. Monica requested an RFA unit staff member contact Es. G. and assist her with the process. In September 2023, Monica again contacted Es. G. and requested identification for all adults in the household. Es. G. complied with the directive the next day and also sent proof she had completed a SAFE sleep and sudden infant death

14.

syndrome training. The report stated the Department would continue to assess Es. G. for placement of A.G.

The Department recommended termination of Mother's and E.A.'s parental rights to A.G., M.G., and E.G., continued foster care with a permanent plan of placement with a fit and willing relative for A.G., and adoption for M.G. and E.G.

An addendum report prepared in October 2023 by Monica addressed the siblings' relationship. The report reflected that A.G., M.G. and E.G. were placed together between December 2020 and March 2021, at which time they were separated and "continued to move to different foster home[s] due to their behaviors." The three siblings were together again in a placement between June 2022 and August 2022, but the caregivers could not manage A.G.'s "very defiant" behavior.

During the family reunification phase, the children visited at least weekly, but since then, they visited monthly. Monica reported the three ate, watched movies and played together, but they left visits without any emotional distress. M.G.'s and E.G.'s caregivers reported the two did not ask to see A.G. and did not talk about their visits. The caregivers reported that when A.G. had been placed with them, she was controlling toward M.G. and E.G., and would hit them for not listening to her.

A.G.'s caregiver also reported A.G. was "'kind of mean'" to M.G. M.G. stated she felt good about A.G. living in a different foster home because A.G. hit her and lied about E.G. E.G. stated A.G. was mean to him and bossed him around. Asked how they would feel if they were adopted and did not see A.G. again, M.G. said she wanted to see A.G., "'but just her and then she can leave.'" E.G. said, "'good.'" A.G. said she would be "'mad'" if M.G. and E.G. were adopted and she did not see them again because they were her siblings. The report concluded the three had a sibling relationship, but not a significant one that outweighed the benefits of adoption for M.G. and E.G., who appeared well-adjusted in their placement.

An addendum report from January 2024 reflected that Es. G. and A.G. had progressed to unsupervised and overnight visits in December 2023, which both reported were going well. A.G. reported she would be okay if placed with Es. G., but would miss her current caregiver. M.G. and E.G. expressed they wanted to remain in their current placement, and they visited with Mother and A.G., but did not really want to. Their caregivers reported they had to encourage M.G. and E.G. to visit.

The Department's recommendations for a permanent plan remained the same, but the report recognized A.G. had a relationship with Mother, seeking her direction and approval, showing affection to her, and expressing wanting to return to her care. The report reflected that M.G. and E.G. did not appear to have a significant parent-child relationship with Mother or E.A., and it recommended termination of parental rights as to M.G. and E.G.

An addendum report from March 2024 reflected three visits between Mother, A.G., M.G., and E.G. A.G. appeared more excited to see Mother than M.G. and E.G., and although M.G. and E.G. accepted Mother's affection, they did not return it. The report documented the children ate and played together, but A.G. displayed some annoyance with M.G. and E.G., and she raised her hand toward them at times. M.G. and E.G. expressed they would be fine if they did not visit A.G. anymore, but A.G. expressed she would be mad if she did not see them anymore due to their adoption. The three siblings had not been together in a placement for approximately 18 months, and the social worker stated that she had not observed the children asking about one another or asking to visit.

The Department's report stated that A.G. appeared to have a relationship with Mother, and it anticipated placing A.G. with Es. G. within the next 60 days. However, it did not appear severing M.G.'s and E.G.'s relationship with Mother and E.A. would be detrimental to them. The Department continued to recommend termination of parental

16.

rights as to M.G. and E.G., placement with a fit and willing relative for A.G., and adoption for M.G. and E.G.

### 2. Hearing on May 1, 2024

On May 1, 2024, the section 366.26 hearing commenced with a Spanish interpreter for Mother and Es. G.  E.A. appeared telephonically and was also assisted by an interpreter.

### a. Social Worker's Testimony

The Department submitted on the six reports previously summarized in part IX.B.1. of this opinion's factual and procedural history.  Monica, the social worker who had been assigned to the case since June 2023, testified that the Department recommended continued foster care with placement with a fit and willing relative for A.G., who was placed with Es. G. by then, and adoption by their current caregivers with termination of parental rights for M.G. and E.G.  A.G. had been visiting with Mother once a month, but M.G. and E.G. refused visits in March and April.  Monica supervised a visit the day before the hearing and M.G. and E.G. seemed "a little scared and confused." They had to be encouraged to say hello, but, once inside, the visit went okay.  In response to A.G.'s questions, M.G. stated she did not want to live with A.G. or Mother, and she talked about being scared and the police.  Monica then redirected them away from that topic.  She testified there was some tension during visits and the children parted without any signs of emotional distress.  When asked if the children asked about each other or wanted additional visits, Monica said A.G. did, but M.G. and E.G. did not.  They consistently expressed they wanted to be adopted by their caregivers and did not mind if they did not see A.G. again.

In Monica's opinion, M.G. and E.G. did not have a beneficial parent-child relationship with Mother.  They had been out of her care since December 2020, did not appear to experience any emotional distress being out of her care, and the benefits of adoption and stability outweighed their relationship with Mother.

17.

On cross-examination, Monica responded yes when asked if Mother had expressed concern the caregivers were coaching M.G. and E.G., who appeared apprehensive and looked to their caregivers before answering any questions. Monica did not document that information in the reports because she had not observed it.

Es. G. interjected at that point and asked if she could speak because she had tried to communicate with the social worker concerning the subject matter of cross-examination. The court directed her to wait.

Monica acknowledged Mother was appropriate and loving with the children, they did not appear afraid of her, and they appeared loving toward A. and unafraid of her. She also clarified M.G. and E.G. only refused the recent visits and Mother communicated her concern about coaching by the caregivers after the April visit was refused.

### b.  Mother's Testimony

Mother testified that prior to their removal, A.G., M.G. and E.G. played well together and were loving toward one another, M.G. did not fear A.G., and neither M.G. nor E.G. complained about A.G. Mother told the social worker she was concerned the caregivers were coaching M.G. and E.G. because they appeared nervous and fearful, and they looked to their caregiver, who gave them a certain look, which she did not describe for the record. However, once they were inside the visiting room, E.G. hugged Mother and the children played happily.

Mother also testified she never missed a visit and she brought presents for the children, but the caregivers would refuse to take the presents and food she brought. She also testified she loved her children, and when they were with her, M.G. and E.G. never showed any fear of A.G., and she had never seen A.G. be mean to them. Mother testified A.G. was doing well with Es. G. and if the children were not returned to her, she would like them to be with Es. G.

18.

### c. Es. G.'s Statement

After counsel made their arguments, the court invited Es. G. to make a statement. Es. G. gave a detailed statement in which she said she and her older sister had been trying to get her siblings since the day after they were detained from Mother. Es. G. asked the court why they had not been given the opportunity to care for their siblings. She said the then-assigned social worker, Daniel, said he would see what he could do, but then never called her back. After she called him, he told her she needed a driver's license, a passport, and a home with enough rooms, so she secured those things and told him, but he never responded back. Over time, several other social workers were assigned. Es. G. met with a social worker named Reyna in the office and asked about picking her siblings up, but Reyna told her the case had advanced already and she could not do anything. After Reyna left, Es. G. contacted the new social worker, Maribel, and asked what she needed to do to become her siblings' caretaker. She said Maribel sent her links to videos on becoming a foster parent, but Maribel never returned her calls after she reached out the next day to say she had watched the videos and was ready for the next step.

The case was then assigned to Monica. With the help of an interpreter because Es. G. did not speak English, Monica assisted her in becoming a foster parent and she subsequently obtained placement of A.G. She was told she could only have A.G. because A.G. was having problems in foster care and moving placements due to behavioral issues that required medication, while M.G. and E.G. were doing fine in their placement. Es. G. stated she had not had any issues with A.G., however, and A.G. was doing well without any medication. Es. G. told the court that she was asked throughout the process if she would be willing to sever ties with Mother and she responded she would do whatever it took to gain placement of her three siblings. She said she did not have an attorney and she had tried to communicate through Mother's attorney, but he did not speak Spanish.

Es. G. also addressed two recent sibling visits. At the first one she described, M.G.'s and E.G.'s caretaker appeared to discourage them from getting out of the car for

19.

their visit with A.G., and when the social worker who was supervising the visit went to get them, the caretaker shook his head at her. M.G. and E.G. then indicated they did not want to visit, and their caretaker drove off with them. I.G., who spoke English, was present and told the social worker what she had seen, but the social worker simply said she did not know what happened and would have said something if she had seen anything.

At the second visit, M.G. and E.G. did not appear to recognize Es. G., A.G. or Mother, and when M.G. approached Mother, she looked back at her caretaker. Es. G. turned to look at him, concerned he might be signaling something, and he immediately turned away. The visit then commenced. Es. G. said that when Monica visited her house, she told Monica about what occurred with the visits.

Es. G. asked Monica how she could be heard by the court because she had been seeking her siblings for years and no one heard her. Es. G. stated Monica apologized for past mistakes, but said the case had advanced and it was out of her control. Es. G. questioned if she understood correctly because the children should not have to pay for the social workers' mistakes, but the interpreter shared the notes she took, and Es. G. understood correctly that things were missed by other social workers and it was now out of Monica's control.

Es. G. stated, "I just want to ask your Honor to please hear me when I ask: What do I need to do? I've done everything that I have been told to be able to have my children. I've reached the point where I even cut ties with my mom. We had a very united relationship since childhood with my mom, but for my siblings I cut ties with her. I've done everything that I've been told to do. I just, I want my siblings. Even if I'm asked to never see my mother again, I would do it. I just want my siblings. Even if I'm asked to treat my mother like a stranger, I will do it. I don't understand why my siblings are being taken care of by strangers when their own flesh and blood is ready to take care of them. And I did receive a form, that I'm going to find [a way] to fill out, to request

20.

that they be given to my care." Es. G. addressed a few other issues and concluded, "And so I ask your Honor to hear my voice that was silenced from the first day, but my doors are always open for my siblings."

The court questioned Es. G. concerning visitation and whether, going back to the beginning, she had the opportunity to visit with A.G., M.G. and E.G. Es. G. responded that none of the older siblings was allowed to visit and only Mother had visitation, until she applied to become A.G.'s foster mother and was then able to visit A.G. Es. G. indicated she was told there would be no visitation unless she was the children's foster mother, and she was told she needed to obtain her driver's license and a passport in order to visit. She did so but no one ever called her back. Es. G. confirmed that she would do whatever it took to protect A.G.

The court stated it was unaware of any information that would require Es. G. to sever her relationship with Mother and continued the matter for review of the evidence, facts, and law. Counsel for M.G. and E.G. stated she was unaware from the reports that A.G. was in a placement with Es. G. because the reports identified the placement only as a confidential foster family, and she requested the opportunity to do some investigating and interview the children given Es. G.'s statement. The court granted the Department's requests for updated discovery, the opportunity to make any additional arguments, and to either waive the social worker's appearance or have her appear remotely if she was unable to personally appear. The Department also objected to any hearsay statements made by Es. G.

### 3. Section 388 Petition and Investigative Report

On May 8, 2024, Es. G. filed a section 388 petition seeking placement of M.G. and E.G. The matter was set for a determination whether an evidentiary hearing was necessary at the same time and date as the continued section 366.26 hearing.

On May 22, 2024, counsel for M.G. and E.G. filed a report following her investigation. Based on her interviews with M.G. and E.G., counsel concluded they were

"content and stable in their placement," wanted "to be adopted by their care providers," and did not want "to continue visitation with their biological family, as it causes them fear and distress." Counsel stated that it was "in the best interests of [the two children] to terminate parental rights and implement a plan of adoption."

### 4. Hearing on May 29, 2024

At the hearing held on May 29, 2024, the court addressed section 361.3 and the requirement that the Department consider placement with relatives upon the initial removal of the children and then each time there is a placement change. The court noted that the record reflected at least two placement changes, in addition to the original removal, and that although the reports documented there were relatives present from the beginning, they were silent concerning the Department's actions pursuant to section 361.3. The court stated it was required to address the issue and invited the parties to weigh in on the issues, including Es. G.'s section 388 petition and the report from counsel for M.G. and E.G.

Counsel for the Department stated she had not had the opportunity to look into compliance with section 361.3, but believed the section 388 petition was untimely. She noted that Es. G. was present at the TDM meeting, but it did not seem she had appeared in court and the Department did reach out to her for placement of A.G. With respect to section 366.26 and the investigative report, counsel had no additional evidence or arguments, but the Department disputed that the parental-benefit exception and the sibling relationship exception were applicable.

Counsel for M.G. and E.G. agreed with the Department's position the section 388 position was untimely and had nothing to add beyond the investigative report.

Mother's counsel argued section 361.3 controlled and the family should have been contacted and followed up with to ensure proper placement for the children.

22.

The court noted there were no requests for an evidentiary hearing on the section 388 petition, continued the request for a hearing on the petition, took all the matters under submission, and set the matter for hearing on June 12, 2024.

### 5. Hearing on June 12, 2024

On June 12, 2024, the court held the hearing at which it issued the section 366.26 orders at issue in this appeal. As to A.G., the court found termination of parental rights would be detrimental and that she was remaining in her placement with Es. G., with the possibility of a legal guardianship. As to M.G. and E.G., the court found, by a clear and convincing evidence standard, that they were likely to be adopted (§ 366.26, subd. (c)(1)), but declined to terminate parental rights based on the parental-benefit and the sibling relationship exceptions (*id.*, subd. (c)(1)(B)(i), (v)). The court further found that adoption was not the appropriate permanent plan for the children (*id.*, subd. (b)(1)), and ordered the children's permanent plan be placement with a fit and willing relative (*id.*, subd. (b)(6)). The court found the children's current placement with their foster family was appropriate, but ordered the children be transitioned to placement with Es. G. via an appropriate plan. The court denied Es. G.'s section 388 petition in light of the section 366.26 orders.

The Department filed a notice of appeal.

## X. Motion to Stay Placement Order Pending Appeal

On July 1, 2024, the Department filed a motion to stay the juvenile court's placement order pending appeal. The court denied the motion to stay on July 17, 2024, and, on that date, M.G. and E.G. filed a notice of appeal from the section 366.26 orders.

## DISCUSSION

As the parties recognize, the issue of the relative placement preference under section 361.3 was raised in the juvenile court at the May 1, 2024, hearing set for selection and implementation of a permanent plan for the three children under section 366.26, and the relative placement preference informed the court's section 366.26 orders, as the court

attempted to remedy the Department's noncompliance with section 361.3 and serve the children's best interests through the lens of its permanency planning orders. The result was procedurally flawed given that the court did not separately address the relative placement preference under section 361.3 or consider the statute's nonexhaustive list of factors, but we do not agree that the court erred in recognizing and attempting to address the Department's failure to comply with section 361.3 throughout the course of this dependency case. We necessarily start with the relative placement preference under section 361.3 because resolution of that issue informs the disposition of this appeal.

## I.      Legal Principles

### A.      Section 361.3

"The purpose of California's dependency law is 'to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm.' (Welf. & Inst. Code, § 300.2, subd. (a).) In its effort to achieve this overarching goal, the law balances a number of vital interests: children's interests in safe and stable homes; parents' interests in raising their children; families' shared interests in each other's companionship; and the state's interest in protecting society's most vulnerable members. [Citations.]

"Dependency proceedings span up to four stages: jurisdiction, disposition, reunification, and permanency. [Citations.] At the jurisdictional stage, the juvenile court determines whether to declare a child a dependent of the court because the child is suffering, or at risk of suffering, significant harm. (Welf. & Inst. Code, § 300.) At the dispositional stage, the court decides if the child can be returned to, or must be removed from, a parent's custody. (Welf. & Inst. Code, §§ 315, 319.) During the reunification stage, qualifying parents are offered services to address the causes that led to the loss of custody. (*Id.*, § 361.5, subd. (a).) Finally, if the child cannot be safely returned to the

parent within a statutorily specified timeframe, the juvenile court proceeds to the permanency stage, where it either terminates parental rights and places the child up for adoption or it selects another permanent plan, such as placement with a guardian or in long-term foster care.  (§ 366.26.)  Throughout the proceedings, the juvenile court is instructed to pay careful attention to the well-being of the child, the efforts of the parent, and the services provided by the state to ensure that cases proceed to this final stage only when necessary." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 623–624, fn. omitted.)

Within the dependency scheme lies a statutory relative placement preference, which provides, "In any case in which a child is removed from the physical custody of their parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative …." (§ 361.3, subd. (a).)  Determining whether placement with a relative is appropriate requires the social services agency and the juvenile court to consider a set of enumerated factors, although consideration is not limited to those factors.  (*Ibid.*)  "'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (*Id.*, subd. (c)(1).)

"'The statute does "not supply an evidentiary presumption that placement with a relative is in the child's best interests" but it does require the social services agency and juvenile court to determine whether such a placement is appropriate.'  (*In re R.T.* (2015) 232 Cal.App.4th 1284, 1295–1296 (*R.T.*), quoting *In re Stephanie M.* (1994) 7 Cal.4th 295, 320.)  'The correct application of the relative placement preference places the relative "at the head of the line when the court is determining which placement is in the child's best interests."'" (*N.J., supra*, 104 Cal.App.5th at p. 123, quoting *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1033 (*Cesar V.*).)

As recently summarized in *N.J.*, "The shifting preferences applicable to a child's placement are subject to some dispute.  On one end, it is settled that until disposition, the

relative placement preference applies.  (§ 361.3, subd. (a); see also [*In re*] *M.H.* [(2018)] 21 Cal.App.5th [1296,] 1303.)  On the other end, after termination of parental rights and selection of a permanent plan of adoption, a caretaker placement preference applies 'over all other applications for adoptive placement.'  (§ 366.26, subd. (k).)  In between those points, however, the law is less settled.  (See *In re Stephanie M., supra*, 7 Cal.4th at pp. 319–320 [declining to hold that the relative placement preference does not apply after termination of reunification services].)

"Some courts have concluded that the relative placement preference applies after disposition only when '"a new placement of the child must be made."'  [*In re*] *M.H.* [(2018)] 21 Cal.App.5th [1296,] 1303, quoting § 361.3, subd. (d).)  Other courts have applied the relative placement preference 'at least through the reunification period,' even where no new placement is necessary.  (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 794; see *In re Sarah S.* (1996) 43 Cal.App.4th 274, 285 ['the preference afforded by section 361.3 applies to placements made before the juvenile court has terminated reunification services']; *In re Jessica Z.* (1990) 225 Cal.App.3d 1089, 1098–1099.)  [¶] A number of courts have also applied the relative preference to the period between termination of reunification services and termination of parental rights … where the relative requested placement early in the process and the delay in assessing placement was due to failures by [the agency] and the court." (*N.J., supra*, 104 Cal.App.5th at pp. 124–125, fn. omitted.)  This is the situation we confront in this case.

###### B.  *R.T.*/*Isabella G.*/*N.J.* Line of Cases

####### 1.  *R.T.*

In *R.T.*, notwithstanding the juvenile court's termination of parental rights and placement of the child for adoption, the Court of Appeal found that the relative placement preference applied where the relatives sought placement early in the proceeding, the agency and the juvenile court failed to discharge their statutory duties, and the relatives filed a section 388 petition prior to the section 366.26 hearing.  (*R.T., supra*, 232

Cal.App.4th at pp. 1293–1295.)  In that case, two paternal aunts sought to have their two-week-old nephew placed with one of them, but the social worker later conceded the agency never considered placement.  (*Id.* at p. 1293.)  The aunts remained interested in placement, with the support of the child's parents, but at the combined jurisdiction and disposition hearing, the court ordered a permanent plan of placement with the father's ex-girlfriend and her husband, with whom the child had been placed after being taken into protective custody following his birth, and set a section 366.26 hearing.[7]  (*R.T., supra*, at pp. 1292–1293.)  After the aunts were approved for placement, "[t]he agency refused to consider moving the child from his placement with [father's ex-girlfriend] and there [wa]s no indication in the record that the agency ever evaluated the relatives for placement under the relevant statutory criteria."  (*Id.* at p. 1293, citing § 361.3, subd. (a).)  One of the aunts filed a petition under section 388 seeking to change the child's placement, but shortly thereafter, the agency recommended termination of parental rights and adoption by father's ex-girlfriend and her husband.  (*R.T., supra*, at pp. 1293–1294.)  After an evidentiary hearing, the court found section 361.3 inapplicable and denied the section 388 petition.  (*R.T., supra*, at p. 1294.)  The court thereafter held the section 366.26 hearing, terminated parental rights, and placed the child for adoption.  (*R.T., supra*, at p. 1295.)

On review, the appellate court found, "[I]n addition to its failure to provide written notification, the agency failed to consider the relatives for placement when they came forward.  (§ 361.3.)  A relative's home was not 'the first placement to be considered and investigated,' as the statute requires.  (§ 361.3, subd. (c)(1).)  Worse, a relative's home was never given good faith consideration."  (*R.T., supra*, 232 Cal.App.4th at p. 1297.)  "[T]he temporary placement of the infant did not relieve the agency of the obligation to honor the statutory preference for relative placement.  The agency failed thereafter to

---

[7]     The father's ex-girlfriend had custody of their three children and the father's teenage son, whom she helped raise.  (*R.T., supra*, 232 Cal.App.4th at pp. 1292–1293.)

investigate and consider relative placement and weigh it against the benefit of placing the infant in the home where his much older brother had been placed. The agency knew of the paternal aunts' interest in placement … when the child was less than two weeks old. At the paternal aunts' insistence, the agency assessed their homes for safety but did so without any intention of determining if relative placement was appropriate under the statutory criteria." (*Ibid.*, citing, § 361.3, subd. (a).) "There is nothing in the record to indicate that a relative placement evaluation under statutory standards was performed," and the child's "caseworker testified she never considered the relatives for placement and said the agency's 'plan from day one has only been to consider adoption of this child' by [father's ex-girlfriend] and not his paternal relatives." (*R.T., supra*, at p. 1297.)

The appellate court concluded, "The court erred in deeming relative preference under section 361.3 inapplicable to postdisposition proceedings." (*R.T., supra*, 232 Cal.App.4th at p. 1300.) The court explained it was "presently unsettled whether a relative is entitled to preference when requested late in the proceedings, when the child is in a stable placement following the dispositional hearing and termination of reunification services" (*ibid.*), but "[t]he issue has no bearing here, where the relatives invoked the preference *before* the dispositional hearing, the agency and court failed to apply it at disposition, and the error was timely raised by a section 388 motion. Under these circumstances, the court should have directed the agency to evaluate the relatives for placement under the relevant standards (§ 361.3, subd. (a)(1)–(8)) and, upon receipt of the evaluation and the agency's placement recommendation, exercised its independent judgment to consider if relative placement was appropriate [citation]. If the court found relative placement inappropriate it was required to state its reasons on the record. (§ 361.3, subd. (e).) The court failed to do any of this, instead applying a generalized best interest test unguided by the relevant statutory criteria" (*ibid.*). The appellate court acknowledged the problems created by the later stage in the proceedings, but held, "The errors reflected in this record compel this court to remand for further proceedings

conducted under proper standards, although effective redress may or may not be possible given the passage of time spent with other caretakers and the child's current best interest. We leave that difficult determination for consideration by the juvenile court on remand." (*Id.* at p. 1292.)

### 2. *Isabella G.*

The decision in *R.T.* was followed by *Isabella G.* (*Isabella G., supra*, 246 Cal.App.4th 708.) In *Isabella G.*, the appellate court considered another early request for placement by a relative where the agency failed to discharge its statutory duties under section 361.3. (*Isabella G., supra*, at p. 712.) The child's grandparents repeatedly requested placement from the beginning, when the child was first taken into protective custody. (*Id.* at p. 711.) The agency did not assess their home, as required by section 361.3, and instead placed the child with a nonrelative extended family member. (*Isabella G., supra*, at p. 711.) The agency misrepresented to the grandparents and other relatives that it could not change the placement for one year. (*Ibid.*) The grandparents sought placement after the year passed and the agency again failed to assess them for placement. (*Ibid.*) After reunification services were terminated and the agency continued to disregard their request for placement, the grandparents retained an attorney and filed a section 388 petition. (*Isabella G., supra*, at pp. 711–712.) The grandparents were then assessed and approved for placement within three weeks, but the juvenile court denied their request to proceed under section 361.3 and applied the caregiver adoption preference under section 366.26, subdivision (k). (*Isabella G., supra*, at p. 712.) On review, the agency conceded the court erred in applying the caregiver adoption preference because parental rights had not yet been terminated, but argued section 361.3 did not apply given the reunification period had ended and there was no need for a new placement. (*Isabella G., supra*, at p. 712.)

The Court of Appeal agreed with *R.T.*, stating, "The Agency is *required* to assess those relatives seeking placement according to the factors described in section 361.3,

subdivision (a) (placement factors) and must document those efforts in the social study prepared under section 358.1.  (§ 361.3, subd. (a) (final par.).)  When considering whether to place the child with a relative, the juvenile court must apply the placement factors, and any other relevant factors, and exercise its independent judgment concerning the relative's request for placement.  (*Cesar V., supra*, 91 Cal.App.4th at p. 1033.)  [¶] Ideally, the statutory scheme contemplates the Agency has identified and approved the child's relatives for placement before the dispositional hearing.  However, '[c]onsistent with the legislative intent for children to be placed immediately with a responsible relative, [section 361.3] does not limit the county social worker's ability to place a child in the home of an appropriate relative or a nonrelative extended family member *pending the consideration of other relatives who have requested preferential consideration*.' (§ 361.3, subd. (b), italics added.)"  (*Isabella G., supra*, 246 Cal.App.4th at p. 719, fn. omitted.)

On the facts of the case, which the appellate court described as "more egregious" than those in *R.T.*, the court agreed with *R.T.*, finding "the juvenile court erred when it determined section 361.3 did not apply because reunification services had been terminated."  (*Isabella G., supra*, 246 Cal.App.4th at pp. 722, 723.)  Further, the juvenile court erred "when it imposed a burden on [the] Grandparents under section 388 to show that a new placement was necessary and that the *change of placement* was in the child's best interest."  (*Id.* at p. 723.)  The appellate court "reject[ed] the argument the relative is required to file a section 388 petition to trigger a relative home evaluation, and may lose his or her right to preferential consideration for placement under section 361.3 if a section 388 petition is not timely filed."  (*Id.* at p. 722.)  Instead, "[t]he obligation to assess a relative's home is triggered by the relative's request for placement of the child." (*Ibid.*, fn. omitted.)  "The record shows the Agency disregarded the legislative preference for relative placement throughout [the child's] dependency case.  The Agency's conduct was inconsistent with the Legislature's clear preference for relative placement."  (*Id.* at

30.

p. 723.)  The court reversed the juvenile court's order finding section 361.3 did not apply and denying the section 388 petition, reversed the section 366.26 orders, and remanded for a hearing under section 361.3.  (*Isabella G., supra*, at pp. 724–725.)[8]

### 3. *N.J.*

Recently, in *N.J.*, the appellate court reached the same conclusion as *R.T.* and *Isabella G.*, and the decision is cited by Mother in support of her argument.  (*N.J., supra*, 104 Cal.App.5th at pp. 125–126.)  In *N.J.*, the child was taken into protective custody following her birth.  (*Id.* at pp. 104–105.)  She was placed with a foster caregiver, with whom she remained.  (*Id.* at p. 105.)  A maternal aunt sought placement the day after the child's birth, when the child was detained; the aunt was listed in the detention report as a possible relative for placement; and at the detention hearing, the court ordered the agency to assess all relatives for placement, including the aunt.  (*Ibid.*)  The agency's subsequent jurisdiction/disposition report did not include any information concerning the aunt, and at the jurisdiction hearing, the court ordered the agency provide an update on placing the child with the aunt in its next report.  (*Id.* at p. 106.)  Thereafter, the agency reported placement with the aunt was pending.  (*Ibid.*)  Four months later at the disposition hearing, based on a request by the mother's counsel, the court again ordered the agency to continue assessing relatives, including the aunt.  (*Id.* at p. 107.)  The aunt received RFA the next month, but although the agency informed the caregiver it intended to give her a

---

[8]     In *Maria Q.*, the appellate court considered whether the rule from *Isabella G.* "applies to a postpermanency relative placement request where the agency did not properly consider that relative's request for placement during the reunification period."  (*Maria Q., supra*, 28 Cal.App.5th at p. 597.)  The court concluded it did not, explaining, "[W]e decline to extend the directive to give 'preferential consideration … to a request by a relative of the child for placement of the child' to a postpermanency request for placement.  (§ 361.3, subd. (a).)  To do so would upend the precise statutory scheme governing the selection and implementation of a child's permanency plan.  (See §§ 366.26, 366.3.)  At the time [the] Aunt filed her petition, the overriding focus of dependency proceedings was not on [the] Aunt's interest in caring for the children but on the children's interests in securing the most stable, safe and secure permanency plans possible under the circumstances."  (*Ibid.*)

14-day notice and place the child with the aunt, there was no record it issued the notice. (*Id.* at pp. 107–108.)

Scheduling difficulties arose concerning visitation, which impacted the aunt's ability to bond with the child. (*N.J., supra*, 104 Cal.App.5th at p. 108.) The caregiver eventually took the position that moving placements would be detrimental to the child, and the facts as summarized in the opinion suggest the caregiver was uncooperative to some extent in terms of making the child available for visits. (*Id.* at pp. 108–111.) The aunt eventually began unmonitored visits when the child was 15 months old (*id.* at p. 112), but two days earlier, the court terminated reunification services and set the matter for a section 366.26 hearing (*N.J., supra*, at p. 111). At that review hearing, the mother's counsel requested a section 361.3 hearing. (*N.J., supra*, at p. 111.)

Prior to the section 361.3 hearing, the caregiver filed a de facto parent request, and the agency recommended the child remain with the caregiver. (*N.J., supra*, 104 Cal.App.5th at p. 112.) At the hearing, the court granted de facto parent status to the caregiver and denied the section 361.3 motion on the grounds that the case did not fall into a category that allows application postdisposition and that it was not in the child's best interest given the bond with the caregiver. (*N.J., supra*, at pp. 113–114.) Thereafter, the court set adoption as the permanent plan and, four months later, terminated parental rights and designated the caregiver as the prospective adoptive parent. (*Id.* at p. 114.)

On review, the appellate court was unsparing, stating that with respect to the relative placement preference under section 361.3, the agency "and the juvenile court utterly failed to perform [their] duties in this case and, as a result, failed this family." (*N.J., supra*, 104 Cal.App.5th at p. 112.) The agency failed to "comply with its duty of due diligence in assessing [the] aunt for possible placement," and the juvenile court compounded the failures by not holding the agency "accountable for its lack of diligence" and "violat[ing] its own duty to assess [the] aunt under the relative caregiver preference at the disposition hearing at the latest." (*Id.* at p. 126, citing §§ 361.3, subd. (b), 361.21.)

32.

Having repeatedly made clear that the aunt wanted consideration for placement, neither the aunt nor the mother was required to do more. (*N.J., supra*, at p. 126.) The court concluded the juvenile court erred in finding the relative placement preference did not apply and the error was not harmless. (*Id.* at pp. 127, 130.) The court stated, "We recognize that '[t]he relative placement preference … is not a relative placement guarantee.' (*In re Joseph T.* [(2008)] 163 Cal.App.4th [787,] 798, italics omitted.) In addition, '[t]he passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of her best interests.' (*In re Lauren R.* (2007) 148 Cal.App.4th 841, 855.) However, [the] mother and [the] aunt are entitled to a full and fair assessment of the relative placement preference and [the child's] best interests, following additional reunification services for [the] mother and a meaningful chance at visitation for [the] aunt. It is reasonably likely that such an assessment could lead to a different result upon remand." (*Id.* at p. 130, citing *Isabella G., supra*, 246 Cal.App.4th at p. 725.)

## II.    Standard of Review

"In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if … supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.'" (*In re Caden C.* (2021) 11 Cal.5th 614, 640.) Although "the practical difference between the standards is not likely to be very pronounced" (*id.* at p. 641), "[r]eview for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination."" [Citation.] But ""[w]hen two or more inferences can reasonably be

deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court'"'"'" (*ibid.*).

"Broad deference must be shown to the trial judge.  The reviewing court should interfere only '"'if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did.'"'"  (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067; accord, *Ed H. v. Ashley C.* (2017) 14 Cal.App.5th 899, 904; *In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1421.) "'We are required to uphold the ruling if it is correct on any basis, regardless of whether it is the ground relied upon by the trial judge.'"  (*Robert L., supra*, at p. 1067; accord, *Ed H., supra*, at p. 904.)

## III.    Applicability of Section 361.3 Relative Placement Preference

### A.      Es. G.'s Unsworn Statement

As a threshold matter, we address Es. G.'s unsworn statement.  Although the Department does not develop its argument that the juvenile court abused its discretion in considering Es. G.'s statements (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363–364; Cal. Rules of Court, rule 8.204(a)(1)(B)), the Department asserts within its briefing that Es. G.'s statement was unsworn and should not have been considered.[9]  The record is clear that the juvenile court treated Es. G.'s statement as evidence and that the court intended to and did consider her statement along with other evidence in the record. It is equally clear that the parties were on notice of this, and the Department expressly objected only to consideration of any hearsay statements related by Es. G.[10]  It did not request Es. G. provide sworn testimony and it did not seek to question Es. G.

---

[9]      M.G. and E.G. do not advance any separate arguments concerning the court's application of section 361.3 to its placement change order, but they join in the Department's opening and reply brief arguments as to those issues.

[10]      Notwithstanding the Department's objection, "[e]vidence of an out-of-court statement may be admitted for the nonhearsay purpose of showing its effect on the listener so long as that effect is relevant to an issue in dispute," and Es. G.'s understanding and actions in response to social workers' statements were relevant to the inquiry.  (*People v. Ramirez* (2022) 13 Cal.5th

Moreover, compliance with section 361.3 was at issue over the course of three hearings. Prior to the final hearing, the court noted the absence of any requests for an evidentiary hearing on Es. G.'s section 388 petition concerning placement, and the record expressly reflects the Department was afforded the opportunity to investigate and address the section 361.3 allegations. It declined to avail itself of these opportunities. The Department's inaction in the juvenile court waived any objection to the court's consideration of Es. G.'s statement, beyond the hearsay issue, resulting in forfeiture of any claim on review that the court erred in considering unsworn testimony. (*In re Katrina L.* (1988) 200 Cal.App.3d 1288, 1299 ["[N]o constitutional provision is violated if unsworn testimony is received. If the adequacy of the oath taking is not raised in the trial court, the issue is deemed waived on appeal."]; *In re Heather H.* (1988) 200 Cal.App.3d 91, 95 ["*In the absence of a waiver*, such as a failure to object or a stipulation, unsworn testimony does not constitute 'evidence' within the meaning of the Evidence Code." (Italics added.)]; *People v. Carreon* (1984) 151 Cal.App.3d 559, 579 ["[I]f a witness is permitted to testify without having taken the appropriate oath, the defect must be timely noted and failure to do so constitutes a waiver."]; *Estate of Wilson* (1953) 116 Cal.App.2d 523, 526 ["An objection that evidence is incompetent because the witness has not been sworn is waived if not made when the evidence is offered or at least while the defect is capable of being remedied."].)

**B.  Timing of Es. G.'s Request for Placement**

Next, the Department argues that no *party* raised the issue of relative placement during section 366.26 proceedings, and that the issue was not raised at all until Es. G. filed a section 388 petition, after the section 366.26 matter was taken under submission. First, to the extent the Department is intimating that only the parties have a protected

997, 1115; accord, *People v. Montes* (2014) 58 Cal.4th 809, 863.) For the purpose of resolving this appeal, it is unnecessary for us to parse Es. G.'s statement for admissibility because her description of what she did, coupled with the Department's reports, is sufficient to support the juvenile court's ruling concerning the applicability of section 361.3.

interest at stake with respect to the relative placement preference under section 361.3, that is incorrect. It has long been recognized that section 361.3 "protects a relative's 'separate interest' in a relationship with the child." (*In re A.K.* (2017) 12 Cal.App.5th 492, 499, quoting *Cesar V., supra*, 91 Cal.App.4th at pp. 1034–1035.) Furthermore, it has long been recognized that "[t]he obligation to assess a relative's home is triggered by the relative's request for placement of the child" (*Isabella G., supra*, 246 Cal.App.4th at p. 722, fn. omitted), and there is no requirement that the relative file a section 388 petition to trigger evaluation or risk losing the preferential consideration right under the statute (*ibid.*).

In this case, there was no dispute that Es. G. sought placement within days of the children's removal from their home. The detention report documented Es. G.'s expression of willingness to take the children if necessary, which occurred one day after the children were taken into protective custody.[11] Es. G. also participated in the TDM meeting the next day. In the combined jurisdiction and disposition report prepared a month later, the Department specifically stated that the concurrent plan for all five children was placement with a fit and willing relative and that the Department was going to contact Es. G. to discuss placement. The section 366.26 report, prepared almost three years later, reflected that in August 2023, Monica, who was the social worker then assigned to the case, contacted Es. G. with the assistance of a Spanish interpreter and addressed the possible placement of A.G., who was having behavioral issues.[12] Es. G.

---

[11]    The Department dismisses this evidence by stating Es. G. lived in a studio apartment at the time and would not have been able to take placement due to limited space. This may have been so, but no such concern was documented in the record and the evidence shows the Department knew Es. G. was interested in placement from the beginning of the proceedings. The argument is also undermined by the Department's report only one month later stating that Es. G. would be contacted to discuss placement, the absence of any evidence she was assessed for placement, and her statement to the court that although she had plenty of room in the studio, she nevertheless moved after being told she needed a home with more rooms.

[12]    In the report, Monica documented that she asked Es. G. about living next door to Mother, but Es. G. said she had not lived there for more than one year. This hints at *a* factor the

informed Monica she had been interested in placement of the children and had sought instruction on completing the steps. Consistent with her later statement to the juvenile court, the report documented that Es. G. told Monica she had watched a video and was told she would get something in the mail, but nothing came. When Monica followed up with the RFA unit to see where Es. G. was in the process, she was informed there was no file for Es. G. Monica then requested a unit member contact Es. G. and assist her with the process.

Thus, contrary to the Department's characterization, this is not a case where a relative raised the issue of placement for the first time via a section 388 petition filed late in the case. Instead, the record supports Es. G.'s representation that she sought placement from the outset of the case. We also take issue with the Department's assertion that Es. G. filed her section 388 petition after the close of evidence and submission of the section 366.26 matters. While the court heard from Es. G. after Monica and Mother testified, the court continued the hearing twice to allow the parties to investigate the issues raised, and the court was clear it would entertain further evidence or argument as desired by the parties. Es. G. filed her section 388 petition after the first hearing but before the second one, and any suggestion by the Department that it was deprived of a full and fair opportunity to address the issue is belied by the record.

### C. Reliance on *V.S.* and *J.Y.*

The Department analogizes the court's action in addressing the section 361.3 issue to the court's erroneous sua sponte application of the sibling relationship exception in *V.S.* (*In re V.S.* (2024) 104 Cal.App.5th 1154 (*V.S.*).) However, we are not persuaded that *V.S.* has any application here. In that case, the appellate court found the juvenile court erred when it raised the sibling relationship exception sua sponte and applied it, and when it

---

Department may have considered concerning earlier placement with Es. G., but, if so, it was not documented in the record and it would have been only one of numerous factors the Department was required to consider. (§ 361.3, subd. (a).)

evaluated the sibling relationship exception through the *Caden C.* factors, which apply to the parental-benefit exception. (*V.S., supra*, at pp. 1168–1169.) *V.S.* explained, "'[N]othing in the legislative history nor in the language of the statute itself requires that the juvenile court give sua sponte consideration to the sibling relationship exception when no party has argued it applies'" (*id.* at p. 1168, quoting *In re Daisy D.* (2006) 144 Cal.App.4th 287, 292 (*Daisy D.*), and "sua sponte assertion of the sibling relationship exception undermined the statutory burdens placed upon the parties" (*V.S., supra*, at p. 1168). "'The party claiming that termination of parental rights would be detrimental to the child has the burden of proving the detriment'" (*ibid.*, quoting Cal. Rules of Court, rule 5.725(d)(2)), and as the party opposing termination, the mother bore the burden of demonstrating an exception applied and she did not claim the sibling relationship exception applied (*V.S., supra*, at p. 1168).

It was Es. G., and not the court, who first raised the issue under section 361.3. Irrespective of that distinction from *V.S.*, the Department and the court were on notice that a relative was interested in placement as documented in the Department's reports and, therefore, they each had their own statutory duties under section 361.3. (*N.J., supra*, 104 Cal.App.5th at p. 126; *R.T., supra*, 232 Cal.App.4th at pp. 1297–1300.)

The Department also urges us to follow *J.Y.* (*In re J.Y.* (2022) 76 Cal.App.5th 473 (*J.Y.*).) In *J.Y.*, the appellate court recognized that some cases "have held the relative placement preference applies throughout the reunification period" (*id.* at p. 478, citing *In re Joseph T.* (2008) 163 Cal.App.4th 787, 795), and others "have held the relative placement preference applies even after the reunification period if the relative requested placement during reunification but the child services agency failed to assess the relative for placement" (*J.Y., supra*, at p. 478, citing *Maria Q., supra*, 28 Cal.App.5th at pp. 593, 595 & *Cesar V., supra*, 91 Cal.App.4th at pp. 1027, 1032–1033, 1036). *J.Y.* recognized *Isabella G.*, which, as discussed, "held 'that when a relative requests placement of the child prior to the dispositional hearing, and the Agency does not timely complete a

relative home assessment as required by law, the relative requesting placement is entitled to a hearing under section 361.3.'" (*J.Y., supra*, at pp. 478–479, quoting *Isabella G., supra*, 246 Cal.App.4th at p. 712.)

The court in *J.Y.* concluded that none of those cases supported the juvenile court's decision to place the child with relatives in Arizona, who sought placement for the first time after reunification services were terminated and a permanency planning hearing was scheduled. (*J.Y., supra*, 76 Cal.App.5th at p. 479.) The appellate court found that "the Department *fully complied* with its obligation to assess family members for placement during the reunification period" (*ibid.*, italics added), and the juvenile court erred in ordering placement with the Arizona relatives based on an "unfounded conclusion that the Department failed in its duty under … section 361.3 to give preferential consideration to *other* relatives in California (not the Arizona relatives) who requested placement 'back when the parents were receiving reunification services'" (*id.* at p. 476). The appellate court concluded, "The trial court abused its discretion by setting a section 361.3 hearing after the reunification period ended, where the Department had fulfilled its obligations to assess relatives for placement during reunification, and there was no need to change J.Y.'s placement. With no legal authority to do so, the court ordered J.Y. be uprooted from his stable and loving placement—after the court had declared adoption was the plan, and the de facto parents wanted to adopt him—to place him with virtual strangers." (*Id.* at p. 484.)

This case bears no resemblance to *J.Y.*, factually. As we have discussed, Es. G. sought placement from the outset of the proceedings in December 2020 and continued to do so, but there is no indication the Department complied with its duties under section 361.3 until A.G. required a new placement, almost three years after this case began. Es. G. told the court that she had a studio apartment with plenty of room, and the then-assigned social worker, Daniel, did not call her despite telling her he would see what he could do so she could pick up her siblings. She complied with the directives Daniel

gave her: she obtained a driver's license and a passport, and she moved to a larger residence. However, Daniel did not respond when she told him she did everything he asked of her. At one point, after the case passed through multiple social workers, Es. G. was provided with a link to watch some videos, which she did promptly, but no one called her back when she reached out to ask about the next step.

Eventually, the case was assigned to Monica and, because A.G. needed a placement change, Es. G. was finally given the assistance she should have been given much earlier in this case. As documented in the Department's section 366.26 report, Monica discovered in August 2023 that there was no RFA file on Es. G. and she directed someone from the unit to contact Es. G. The report also reflected that in September 2023, after Monica asked Es. G. to send the identifications for all adults in the household 18 years of age and older to begin the background check, Es. G. complied the next day, and she sent proof she had completed a SAFE sleep and sudden infant death syndrome training. Having finally received the assistance she sought from the outset, Es. G. succeeded in becoming A.G.'s foster mother. At the May 1, 2024, hearing, Es. G. reported to the court that she even severed ties with Mother, despite their closeness, in an effort to secure placement of her siblings.

In short, this case is readily distinguishable from the facts in *J.Y.* and is analogous to the patent errors in *R.T.*, *Isabella G.*, and *N.J.* (*R.T., supra*, 232 Cal.App.4th at p. 1300 [relatives sought placement prior to disposition hearing and the agency failed to comply with § 361.3]; *Isabella G., supra*, 246 Cal.App.4th at pp. 722–723 [relatives sought placement prior to detention, jurisdiction and disposition hearings, and the agency disregarded § 361.3 mandate]; *N.J., supra*, 104 Cal.App.5th at pp. 103, 105 [relatives sought placement on the day of detention, but the agency failed to comply with § 361.3].)[13]

---

[13] The Department also cites *Lauren R.* in support of its argument, but that case did not involve either a relative's request for placement made prior to the disposition hearing or the

**D.**    *N.J.*

In its reply brief, the Department attempts to distinguish *N.J.* on various grounds, none of which is persuasive. Instead, the arguments indicate an attempt to shift the burden of complying with section 361.3 onto Es. G. This is not only impermissible under the law, but it disregards the facts and the record. While we agree the record in this case does not include the detailed failures documented in *N.J.*, that is because the record is mostly silent. Critically, the record does not reflect either the Department or the juvenile court discharged its duties under the statute earlier in the proceedings. (*J.Y., supra*, 76 Cal.App.5th at p. 479.)

The Department asserts that unlike in *N.J.*, there is no evidence Es. G. asked for visits or placement, or that she was able to take placement of all the children in 2021 or 2022. Regarding visitation, the Department points to no evidence Es. G. was offered visitation and declined it or failed to show up for it. She informed the court that she was not allowed to visit and that visits were offered to Mother only. Further, as discussed, this case does not involve a relative seeking placement for the first time at the eleventh hour; the Department was aware of Es. G.'s desire for placement from the beginning and the Department's stated plan prior to the jurisdiction and disposition hearing was to evaluate Es. G. for placement. Regarding the absence of evidence that Es. G. could take placement of all the children in 2021 or 2022, it is unclear if the Department is suggesting that Es. G. needed to prove she had room for all five children, but the argument lacks force given that the two oldest siblings were never in the same placement as the youngest three siblings and that Es. G. stated she moved after being told she needed a larger home.

---

agency's disregard of the relative's request for placement. (*In re Lauren R.* (2007) 148 Cal.App.4th 841, 846 [out-of-state relative requested placement after disposition hearing and social worker initiated Interstate Compact on the Placement of Children paperwork (Fam. Code, § 7900 et seq.)]; see *R.T., supra*, 232 Cal.App.4th at p. 1300 [holding in *Lauren R.* "has no bearing … where the relatives invoked the preference *before* the dispositional hearing, the agency and court failed to apply it at disposition, and the error was timely raised"].)

Moreover, the Department bore the burden of evaluating Es. G., not the other way around, and the Department's reports reflected that as of August 2023, the Department had not begun the RFA process with Es. G., despite its awareness of her as a relative who was interested in placement. The Department's attempt to saddle Es. G. with its burden of section 361.3 compliance, and to excuse its own shortcomings, is particularly egregious given obvious language barriers at issue in this case, of which the Department was aware. It can be difficult even for attorneys to navigate the intricacies of the law, but in addition to the fact that Es. G. is a layperson, neither she nor Mother spoke English. Despite this language barrier, Es. G. complied with the directives she was given by the Department for placement of her siblings, only to be met with silence and inaction from the Department. As well, not everyone has the resources to hire counsel, and the Department's duty to comply with section 361.3 is not contingent upon a relative having resources or sufficient familiarity with legal proceedings to retain counsel early on, let alone at all. The duty to assess Es. G. was triggered by the Department's awareness, from the outset, that Es. G. sought placement. (*Isabella G., supra*, 246 Cal.App.4th at p. 722.)

We are not unsympathetic to the burden the Department and the court were laboring under. We recognize that the system is strained and that this case cycled through multiple social workers, which may have led to the failure at issue. Nevertheless, the Department's failure to comply with section 361.3 under the circumstances presented here cannot be excused, and its attempt to defend its shortcomings on review falls well short of the mark.

So far as the record reflects in this case, the Department's repeated, years' long failure to discharge its duties under section 361.3 was manifest. As a result, this case proceeded for more than three years before the juvenile court became aware of the noncompliance.[14] This negatively impacted M.G. and E.G., who have endured much

---

[14] This case was handled by multiple judicial officers. The judicial officer who addressed the section 361.3 issues received the matter after reunification services were terminated.

disruption in their young lives; their family, one of whom sought placement from the very outset; and their foster parents at the time of the section 366.26 hearing, who had cared for them and desired to adopt them. Given that Es. G. sought placement from the beginning and continued to do so throughout the proceedings, this case is analogous to *N.J.* in terms of the Department's abject failure. We reiterate that social services agencies "cannot completely abdicate their duties in applying the legislative preference of placing detained children with a family member, to the detriment of the child and the family, and then later rely on the passage of time caused by their own failures to preclude that relative from seeking placement of the child as a finding based on the child's best interests." (*N.J., supra,* 104 Cal.App.5th at p. 130, citing In re *Mia M.* (2022) 75 Cal.App.5th 792, 811 (*Mia M.*).)

For the reasons discussed, appellants fail to persuade us that the juvenile court erred when it found section 361.3 applicable. The court clearly found Es. G. credible, a determination we do not reassess on review. (*People v. Brown* (2014) 59 Cal.4th 86, 106 ["'We do not reweigh evidence or reevaluate a witness's credibility.'"].) Furthermore, the Department could have but did not dispute Es. G.'s version of events in the lower court. Nor, on review, does the Department cite to portions of the record that demonstrate its compliance with section 361.3.

### E. Remedy for Noncompliance with Section 361.3

In contrast with *N.J.*, *Isabella G.*, and *R.T.*, the juvenile court here recognized the significance of the Department's failure to comply with section 361.3 and the need for a remedy, which resulted in an attempt to cure the deficiency through the section 366.26 orders. (*N.J., supra,* 104 Cal.App.5th at p. 104; *Isabella G., supra,* 246 Cal.App.4th at p. 712; *R.T., supra,* 232 Cal.App.4th at p. 1308.) However, as the appellate court explained in *Maria Q.*, "The juvenile court is required to select a permanency plan for the child according to the legislative preferences detailed in section 366.26, subdivision (b). (See also § 366.3, subd. (h).) Permanent placement with a relative is a permanency plan

43.

option.  (§ 366.26, subd. (b)(6); see [Cal. Rules of Court,] rule 5.740(a)(6) & (b)(3) [directing the juvenile court to order the agency to make diligent effort to identify and locate relatives as a placement source for a child in continued foster care].)  Nevertheless, it is axiomatic that adoption, then guardianship, are the preferred permanency plans.  ([*In re*] Autumn *H.* [(1994)] 27 Cal.App.4th [567,] 574; see also § 366.26, subd. (b)(4).)  Thus, permanent placement with a fit and willing relative is favored *only* over continued foster care and is disfavored if any other permanency plan is available.  (§ 366.26, subd. (b).)  [¶]  In view of the statutory preferences established by the Legislature to select a child's permanency plan (§ 366.26, subd. (b)), the directive in section 361.3, subdivision (a) to give 'preferential consideration … to a request by a relative of the child for placement of the child with the relative' does not apply.  (See § 366.3, subd. (h).)"  (*Maria Q., supr*a, 28 Cal.App.5th at p. 596.)

Moreover, as the Department contends, having declined to terminate parental rights due to the parental-benefit and sibling relationship exceptions, legal guardianship with the then-current caregivers or other appropriate person was the preferred plan under section 366.26.  (*Id.*, subd. (c)(4)(A).)  Due to the Department's failure to comply with section 361.3, the court ordered that M.G. and E.G. be placed with a fit and willing relative and that the Department transition the children to Es. G.  Given the stage in the proceedings at which the error under section 361.3 came to the court's attention, and the stated belief of counsel for the Department and M.G. and E.G. that it was simply too late to entertain the relative placement preference under section 361.3, there was some conflation of issues, and the court resolved the section 361.3 issues through the lens of its section 366.26 orders.  However, as *Isabella G.* explained, "Section 361.3 requires the juvenile court to evaluate a number of factors, including the child's best interest."  (*Isabella G., supra*, 246 Cal.App.4th at p. 724.)  "'When the proceedings take place under an inappropriate statute, even one requiring similar findings, the parties are not afforded the opportunity to tailor their case to the correct statute, and the trial court

cannot fulfill its responsibility to make findings of fact within the provisions of that statute.'" (*Ibid.*)

Thus, while we reject the Department's claim that the court erred in finding section 361.3 applicable, we conclude that the appropriate remedy is to vacate the section 366.26 orders and remand for further proceedings consistent with this opinion. Almost one year has passed since the challenged orders were issued and the case has continued to proceed forward. We do not know the current status of the children, but the parties do not dispute that as of December 2024, M.G. and E.G. were in a placement with Es. G., along with A.G. It may be that the children are presently thriving with Es. G., and the Department and the children no longer oppose that placement. In that circumstance, the court and the parties may conclude that further proceedings under section 361.3 are unnecessary and only new permanency planning orders are required, the latter a remedy both the Department and Mother request.

Conversely, the Department's December 2024 report documents M.G.'s and E.G.'s difficulty transitioning placements, so it may be that they have not adjusted well. We necessarily leave those issues for the juvenile court and the parties to address on remand, but we make clear that on the facts of this case, section 361.3 applied, as the court correctly found.[15] However, the Department's failure to comply with section 361.3 should have been addressed separately, prior to issuance of any section 366.26 orders and

---

**15** M.G. and E.G. were placed with their relative after the juvenile court's orders were appealed, in contrast with the child in *R.T.*, but given the importance of the interests at stake and the need to remand for further proceedings, the appellate court's closing comments bear repeating: "We recognize that what is in the child's best interests at this point, almost two and one-half years after his birth, may well differ from what would have been his best interests when he was still an infant. The passage of time may have strengthened [the child's] bonds with his caretakers and other circumstances may have developed that bear on an evaluation of his best interest. Meaningful redress for past mistakes may not be possible, but we cannot unwind the clock. The interests of stability and continuity may or may not prevail over familial bonds. This difficult question must be decided in the first instance by the juvenile court under the governing legal standards, which must be applied to the circumstances as they exist at the time of the hearing on remand." (*R.T., supra*, 232 Cal.App.4th at p. 1308.)

with due consideration given the factors set forth in section 361.3, subdivision (a). As stated, "'The statute does "not supply an evidentiary presumption that placement with a relative is in the child's best interests" but it does require the social services agency and juvenile court to determine whether such a placement is appropriate.'" (*N.J., supra*, 104 Cal.App.5th at p. 123, quoting *R.T., supra*, 232 Cal.App.4th at p. 1295.)

## IV.     Challenge to Merits of Section 366.26 Orders Moot

Finally, appellants' main focus is the court's order declining to terminate parental rights to M.G. and E.G. based on the parental-benefit and sibling relationship exceptions. The juvenile court found, by a clear and convincing evidence standard, that M.G. and E.G. were likely to be adopted, but found "a compelling reason for determining that termination would be detrimental to the child[ren]" (§ 366.26, subd. (c)(1)(B)), based on two exceptions: Mother "maintained regular visitation and contact with the child[ren] and the child[ren] would benefit from continuing the relationship" (*id*., subd. (c)(1)(B)(i)) and "[t]here would be substantial interference with [the children's] sibling relationship" (*id*., subd. (c)(1)(B)(v)). Appellants challenge the application of these exceptions on the ground they are unsupported by substantial evidence and the juvenile court abused its discretion in applying them rather than terminating parental rights to M.G. and E.G. and ordering the two children be placed for adoption. (*Id.*, subd. (b)(1).) If we disagree and find an exception to termination of parental rights is applicable, the Department, joined by the M.G. and E.G., claims that legal guardianship is the statutory preference, and the court erred in ordering M.G.'s and E.G.'s placement with a fit and willing relative rather than considering guardianship with their then-current caretakers. (*Id.*, subd. (c)(4)(A).)

Mother's focus is section 361.3, and she does not develop a separate, specific argument that the court's application of the exceptions to termination of parental rights, viewed through the lens of the applicable legal standards,[16] is supported by substantial

---

[16]     Under the beneficial parent-child relationship exception to termination of parental rights, codified in section 366.26, subdivision (c)(1)(B)(i), the parent must establish, by a

evidence, but she more generally addresses the court's duty to act in the children's best interests. (*Maria Q., supra*, 28 Cal.App.5th at p. 591 ["'The best interest of the child is the fundamental goal of the juvenile dependency system, underlying the three primary goals of child safety, family preservation, and timely permanency and stability.'"].) Mother contends, "Given the evidence before it, the court did not abuse its discretion in finding that the unique facts of this case supported that the beneficial exception and sibling exception applied to prevent proceeding to any permanent plan on June 12, 2024. As the court declared, its primary responsibility was to design the best long-term permanent plan for the children."

---

preponderance of the evidence, "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Caden C., supra*, 11 Cal.5th at p. 631, italics omitted.) The juvenile court must ask: "does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' (*In re S.B.* [(2008)] 164 Cal.App.4th [289,] 300.) When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id.* at pp. 633–634, quoting § 366.26, subd. (c)(1)(B)(i).)

"The 'sibling relationship' exception codified in section 366.26, subdivision (c)(1)(B)(v) provides an exception to termination of parental rights when '[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, [(1)] whether the child was raised with a sibling in the same home, [(2)] whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and [(3)] whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption.'" (*In re D.O.* (2016) 247 Cal.App.4th 166, 173, quoting § 366.26, subd. (c)(1)(B)(v) & citing *In re Valerie A.* (2007) 152 Cal.App.4th 987, 998.) "The sibling bond exception is evaluated from the perspective of the child who is being considered for adoption, not the perspective of that child's siblings" (*D.O., supra*, at p. 174, citing *In re Celine R.* (2003) 31 Cal.4th 45, 54–55), and "'[t]he author of the legislation adding the sibling relationship exception anticipated that "use of the new exception 'will likely be rare,'" meaning "that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption"'" (*D.O., supra*, at p. 174, quoting *Daisy D., supra*, 144 Cal.App.4th at p. 293).

In light of our conclusion that the juvenile court did not err in finding that section 361.3 was applicable or that the Department failed to discharge its duties under the statute, necessitating vacatur of the court's section 366.26 orders and remand for further proceedings, we need not determine whether the court erred in declining to terminate parental rights based on an exception. (*In re D.P.* (2023) 14 Cal.5th 266, 276 ["A court is tasked with the duty '"to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it."'"].) Moreover, after this appeal was filed and prior to the review hearing held on December 11, 2024, M.G. and E.G. were placed with Es. G.; and the Department and Mother agree that new permanency plans are needed given the children's changed circumstances.[17] (See *Mia M., supra*, 75 Cal.App.5th at p. 814 [on remand after reversal of juvenile court's order, court may consider facts and circumstances that have arisen since the filing of appeal].) Therefore, appellants' challenge to the court's section 366.26 orders is moot in light of vacatur of the orders, and in view of the children's changed circumstances since this appeal was filed, the exercise of discretion to review the claims notwithstanding their mootness is not warranted. (*D.P., supra*, at pp. 286–287.)

## DISPOSITION

We vacate the juvenile court's section 366.26 orders finding M.G. and E.G. adoptable, but declining to terminate parental rights based on the parental-benefit and sibling relationship exceptions under subdivision (c)(1)(B)(i) and (v) of section 366.26; ordering M.G. and E.G. be placed with a fit and willing relative under section 366.26, subdivision (b)(6); and denying Es. G.'s section 388 petition as moot. We remand the

---

**17** The children seek reversal and remand, but do not address their changed circumstances.

matter for further proceedings consistent with this opinion, to include resolution of any outstanding issues under section 361.3 and a new permanency plan assessment.


                                                    MEEHAN, J.

WE CONCUR:


DETJEN, Acting P. J.


SNAUFFER, J.